## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

PAUL M. ST. JOHN          :      CIVIL ACTION
                                  :
        v.                 :
                                    :      NO. 09-4196
JOHN E. POTTER              :
U.S. POSTMASTER GENERAL    :

## MEMORANDUM

**Baylson, J.**                                         **March 4, 2011**

Plaintiff Paul M. St. John ("Plaintiff") commenced a claim for unlawful retaliation, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e-16 et seq., against his employer Defendant John E. Potter, United States Postmaster General ("Defendant"). Plaintiff alleges that Defendant placed Plaintiff under investigation and ordered him on administrative leave for a period of fifteen minutes in retaliation for Plaintiff's complaints of national origin discrimination to the Equal Employment Opportunity Commission ("EEOC"). Presently before the Court are Defendant's Motion for Summary Judgment (ECF No. 20), which seeks to dismiss Plaintiff's claim, and Plaintiff's Motion for Stay (ECF No. 27). After oral argument on the pending motions and an exhaustive review of the record, and for the reasons that follow, Defendant's Motion is granted and Plaintiff's Motion is denied as moot.

## I.    Procedural History

On March 27, 2007, Plaintiff contacted an EEOC counselor to file an informal complaint, alleging that Defendant had retaliated against him by placing him "off the clock" due to remarks Plaintiff made in his testimony at an EEOC Hearing on Plaintiff's national origin discrimination

claim.  EEOC Inquiry Report, Ex. 13; iComplaints Report; Pl. Depo. at 19-20, 21, 23; Ex. 3.

Plaintiff alleged that his temporary suspension, which Defendant rescinded after fifteen minutes,

had caused him stress and humiliation and Plaintiff sought relief in the form of damages and a

letter of apology.  Id.  On May 19, 2008, the agency issued a Notice of Final Decision on

Plaintiff's subsequent June 20, 2007 formal complaint and found that Plaintiff had not

established a prima facie case of retaliation.  See June 20, 2007 EEO Final Agency Decision, Ex.

16.  The EEOC Office of Federal Operations ("OFO") reversed that decision and ordered the

Postal Service to investigate whether Plaintiff was entitled to compensatory damages and ordered

training and consideration of disciplinary action.  See June 25, 2009 OFO Decision, Ex. 17.

Plaintiff was awarded $300 in nominal compensatory damages.  See August 10, 2009 EEO

Notice of Final Decision, Ex. 18.

On September 16, 2009, Plaintiff commenced this action in federal court against

Defendant, alleging that Defendant unlawfully retaliated against him for engaging in protected

conduct and that, as a result, Plaintiff suffered "emotional stress, humiliation, embarrassment,

and anxiety" (ECF No. 1).   Defendant filed Answers and Affirmative Defenses to Plaintiff's

Complaint on December 21, 2009 (ECF No. 8).

The parties subsequently conducted discovery.  Defendant filed this Motion for Summary

Judgment, on October 14, 2010 (ECF Nos. 20, 21).  Plaintiff filed a Memorandum in Opposition

to Defendant's Motion on November 18, 2010 (ECF No. 24), to which Defendant filed a Reply

on December 2, 2010 (ECF No. 25).  Plaintiff filed a Motion to Stay the pending proceeding on

December 7, 2010 (ECF No. 27).  The Court held oral argument on the parties' motions on

December 15, 2010.   On December 22, 2010, both parties submitted additional letter briefing on

the issues of retaliation, pretext, the admissibility of EEOC determinations, and the relevance of certain deposition testimony (ECF No. 29).[1]

## II.     Factual History

### A.     Plaintiff's Employment

Plaintiff has been employed by Defendant since May 3, 2003, and is a City Carrier at the Elkins Park, Pennsylvania post office.  PS Forms 50, Ex. 1[2]; Employee Detail Report, Ex. 2. Plaintiff was born in Scotland.  Mar. 12, 2003 Application for Employment, Ex. 4.

### B.     Postal Service Policies Regarding Threats of Violence

The Postal Service has a developed a "zero tolerance" policy regarding violence and threats of violence, in response to a history of incidents of workplace violence.  See Joint Statement on Violence and Behavior in the Workplace ("Joint Statement"), Ex. 21;  Employee and Labor Relations Manual ("Manual"), Ex. 22, p. 4; Threat Assessment Guide, Ex. 23, pp. 4-7. In 1992, the Postal Service and related unions issued a "Joint Statement on Violence and Behavior in the Workplace," after one violent incident.  See Joint Statement.  The Statement establishes a policy of "no tolerance of violence or any threats of violence by anyone at any level of the Postal Service[.]"  Id.  The Postal Service has elaborated on the Joint Statement in its Employee and Labor Relations Manual, as follows,

> Violent and/or Threatening Behavior: The Postal Service is committed to the principle that all employees have a basic right to a safe and humane working environment.  In order to ensure this right, it is the unequivocal policy of the Postal Service that there must be no tolerance of violence or threats of violence by anyone at any level of the Postal Service.

---

[1]Defendant's letter brief is undocketed.

[2]Except for where specified as Plaintiff's Exhibit, all exhibits cited in this Memorandum refer to exhibits filed with Defendant's Motion for Summary Judgment (ECF Nos. 20, 21).

Similarly, there must be no tolerance of harassment, intimidation, threats, or bullying by anyone at any level. Violation of this policy may result in disciplinary action, including removal from the Postal Service.

Manual, Section 665.24 (emphasis added). At least one other court in the Third Circuit has recognized the Postal Service as "prohibiting employees from making any actual, implied or veiled threat, made seriously or in jest." Venter v. Potter, 694 F. Supp. 2d 412, 417 (W.D. Pa. 2010) (Conti, J.).

The Postal Service has additionally promulgated a "Threat Assessment Guide," which provides guidance to Postal Service managers "responding to and assessing the seriousness of violent and potentially violent situations." Threat Assessment Guide, p. 1. The Guide defines "zero tolerance" as a policy under which "every act of or threat of violence, regardless of the initiator, elicits an immediate and firm response." Id. at 4. The Guide specifies that an incident may result in, but does not require, a disciplinary response, including the possibility of dismissal. Id. As described in Venter, "[t]hreats made by employees are evaluated on a 'Priority Risk Scale[,]" from "priority 1" threats "deemed to convey an 'Extreme Risk' of violence" to "statements involving 'No Risk' of violence . . . categorized as priority 4 threats." Venter, 694 F. Supp. 2d at 418. The Guide states that an employee "involved in or witness to" an incident may notify one of a list of managers, including the Human Resources Manager. Threat Assessment Guide, p. 7. After an incident occurs, it is the duty of the Human Resources Manager to determine whether the Threat Assessment Team should meet "or whether the situation can be addressed through other [Team] members or ad hoc resources." Id. The Guide further outlines a list of situations in which Threat Assessment Team members should contact Postal Inspectors, including when the Team "is planning to conduct a threat assessment or risk abatement analysis."

Id. at 6.

Plaintiff has testified to his awareness of the Zero Tolerance Policy and knowledge of some of the history that led to its adoption. Plaintiff's September 21, 2010 Deposition at 120-23, Ex. 19.

### C. Events Leading up to Defendant's Investigation of Plaintiff

Plaintiff had filed several formal and informal EEOC[3] complaints against Defendant between 2004 and 2007. iComplaints Report; Pl. Depo. at 19-20, 21, 23; Ex. 3. In one complaint filed on November 3, 2004, Plaintiff alleged that he was not paid for sick leave and was charged for leave without pay as a result of animus by his then-supervisor Joseph McGinn regarding his national origin. Id. The EEOC held an administrative hearing in Plaintiff's discrimination case on March 15, 2007, at which Plaintiff testified. EEO Hearing Transcript, Ex. 6. Defendant was represented by attorney Kathleen Barksdale, who was assisted by Robert Meingossner. Id. Plaintiff proceed pro se. Id.

During Plaintiff's testimony regarding damages, the hearing judge asked Plaintiff how McGinn's actions had affected him. See EEO Hearing Transcript, pp. 67-68, 71, 74. In response, Plaintiff described his anger at McGinn for denying him leave. Id. Plaintiff stated, as

---

[3] In order to pursue a discrimination or retaliation claim under Title VII the plaintiff must first exhaust administrative remedies under those Acts as follows. Pursuant to Title VII, a plaintiff must file an administrative charge with the EEOC within 300 days of the alleged act of discrimination, or within thirty days after receiving notice that the state or local agency has terminated the proceedings under state or local law, whichever is earlier. 42 U.S.C. § 2000e-5 (e)(1). Before filing a complaint in the District Court, the employee must obtain a "right to sue" letter from the EEOC. Id. If the agency fails to take action after the 300 day period, the employee may request a "right to sue" letter, and the EEOC must promptly provide one. Id.

follows,

> And then so not only did I not get it in the first pay period, [McGinn] promised to get it in the second pay period, and it's not there either. I mean, <u>it's like I could have throttled him</u>, you know.
> . . . .
>
> [McGinn] has reneged on redress settlements, and he has complete contempt for that. So again, I get back to the stage where <u>I want to throttle him</u>. Now, I can't throttle him. I can't use violence. I can't deal with the way I've been treated with – with something that is just futile and stupid.
>
> So all those feelings get pushed back inside. So the – and the only out for me is – is – is sometimes when I'm home, and then my wife bears the brunt of it because I'm – I'm coming home like a – like a raging ton of just frustration, and – and she gets that. You know, I mean, and that's not fair on her, you know, and it's like – or the kids get snapped at quicker 'cause I – I'm cranky because McGinn's – has done this to me.
> . . . .
>
> Now, I didn't have the leave. I was expecting the leave to come in. And my wife has a miscarriage, right? <u>Now, I could kill him.</u> I felt like the treatment that I have been subjected to, I couldn't take time off to be with my wife through a miscarriage because he purposely screwed me over time and time again because of this 2004 September thing.

Hearing Transcript, pp. 67-68; 71; 74 (emphasis added).

### D. Investigation into Plaintiff's Testimony

Barksdale deemed Plaintiff's testimony regarding McGinn to be in violation of the Zero Tolerance Policy. Barksdale Depo. at 8. Either during or immediately following the hearing, Barksdale made managers in the Philadelphia district office, including Smith, aware of Plaintiff's testimony. Id. at 18-19. Smith told Barksdale she would contact Lisa Jordan, a Postal Service Human Relations manager. Id.

Smith contacted Acting Senior Manager of Post Office Operations Joseph Sarnocinski. Smith Aff. at 220. On or about the day of the hearing, Jordan was also informed of Plaintiff's testimony. Lisa Jordan EEOC Affidavit at 227, Ex. 7. The various managers convened at a

"previously scheduled Threat Assessment Meeting" on March 20, 2007, to discuss Plaintiff's testimony. Jordan Aff. at 227. This meeting appears to have been conducted at the Postal Service's district office, rather than at the Elkins Park Post Office. Barksdale Depo. at 18-19. According to Smith, the managers made a decision to place Plaintiff on "administrative leave, pending the results of the investigation . . . to protect [Plaintiff's] interest as well as the interest of others involved." Smith Aff. at 220. The managers informed Acting Postmasters James Knowles and Thomas Grill at the Elkins Park office via conference call that Plaintiff should be placed on emergency leave. Brenda Smith September 3, 2010 Deposition at 41, Ex. 12.

On the morning of March 21, 2007, Plaintiff was questioned by Postal Inspector Shawn Dougherty about the testimony given by Plaintiff about McGinn. Smith Aff. at 219-20. Shop steward Christopher Lanetti was also present at the meeting. Pl. Depo. at 80. According to Plaintiff, Dougherty was initially quite "robust" or "aggressive" towards Plaintiff, but his manner softened when Plaintiff explained that he had been involved in "whistle-blowing" prior to the EEOC hearing. Pl. Depo., pp. 82-83, 88. Plaintiff explained to the Postal Inspector that, early in March 2007, Plaintiff and Lanetti had met with Smith and another manager to discuss allegations of falsified "clock ring"[4] records by McGinn and then-Elkins Park Postmaster Howard Guertler. Pl. Depo. at 31-33. An investigation ensued, which discovered clock ring discrepancies. Smith Depo. At 17-19. Plaintiff believed that Dougherty's change in manner was an acknowledgment that Defendant initiated the investigation against Plaintiff in retaliation for Plaintiff's whistle-

---

[4]"Clock rings" refer to the manner by which the Postal Service records when postal workers return to the office from their delivery routes. Pl. Depo. at 43.

blower activities.  Pl.'s Resp. ¶¶ 49-50; Pl. Depo., pp. 81-88.[5]

Plaintiff then provided Dougherty with a written statement giving context to his testimony at the hearing, stating that questions from the judge brought back his anger at McGinn for McGinn's alleged failure to reinstate Plaintiff's leave.  See Pl.'s Statement.  Plaintiff wrote that by "throttle," he was using a "Scottish term for choking," and discussed his testimony regarding his desire to "kill" McGinn as having been made in lieu of a more common Scottish slang term Plaintiff thought the judge would find vulgar.  Id.  Plaintiff wrote that he was aware of the Zero Tolerance Policy, characterized his wording as "regretful," and stated he "would never make such [comments] on the work floor or during [his] duties with the intent to intimidate or threaten anyone."  Id.  Plaintiff returned to his route after the investigation.  Grill Depo. at 19

In the afternoon of March 21, 2007, Plaintiff's supervisor came out to Plaintiff's route and told him to return to the office.  Pl. Depo. at 91-92; Grill Depo. at 23.  There, Grill and Knowles informed Plaintiff that he would be placed on "emergency placement" pending further investigation of Plaintiff's testimony.[6]  Pl. Depo. at 93; Smith Aff. at 220, Ex. 8.  According to Grill, he advised Plaintiff to take anything he needed from his locker, after which Plaintiff would

_____

[5]The parties dispute what was said by Postal Inspector Dougherty at the interview. Lanetti testified in his deposition that he heard Dougherty indicate that Plaintiff was not a "credible threat."  Christopher Lanetti September 17, 2010 Deposition, pp. 49-50, Separate Exhibit.  He also testified that he believed Dougherty to have concluded that Plaintiff was being investigated as a result of Plaintiff's whistle blowing about falsified clock rings.  Id. at 50-51. Lanetti did not testify as to any statement actually made by Dougherty to that effect.   Defendant acknowledges that Lanetti testified as such.  Def.'s Reply ¶¶ 50, 55.  Dougherty has since passed away and did not testify.

[6] Smith stated in an affidavit that the managers decided to place Plaintiff on "non-duty pay status on administrative leave."  Smith Aff. at 220, Ex. 8.  However, Grill characterized the leave as "nonpay, nonduty status."  Grill Depo. at 21.

be escorted to clock out. Grill Depo. at 24-25.

Plaintiff, however, testified that he was told to fully clean out both his locker and vehicle, which he did in front of at least two or three other postal carriers, all the while being "shadow[ed]" by the employee assigned to escort him. Pl. Depo. at 94-95, 101-02, 103. Plaintiff believed the instruction to clean out his locker indicated he would be fired. Pl. Depo. at 96. Plaintiff found the experience of being "parad[ed]" in front of co-workers humiliating and embarrassing. Pl. Depo. at 132-34. Further, Plaintiff had initially perceived from his conversation with Postal Inspector Dougherty that "everything was fine." Pl. Depo. at 93. Thus, he was confused and distressed that he had been allowed to return to work after the meeting with the Inspector, only to be pulled off his route and placed on leave in the afternoon. Pl. Depo. at 133.

Soon after, Postal Inspector Dougherty informed the district operations managers that he had assessed Plaintiff not to be a threat and recommended that he be permitted to remain at work. Smith Aff. at 220. The managers directed Grill and Knowles to inform Plaintiff that he would not be placed on emergency leave. Id. at 222; Smith Depo. at 45. About fifteen minutes after Plaintiff was given the order to go on emergency placement, Grill or Knowles told Plaintiff that the order had been rescinded. Smith Aff. at 222; Pl. Depo. at 104. Plaintiff was never taken off the clock, returned to his route that day, and was paid for the full day of work. Pl. Depo. at 105, 136.

## III.   Parties' Contentions

Plaintiff contends that he was placed on emergency leave from the time he was informed of the leave until the leave was rescinded fifteen minutes later and that this action reflected

retaliation against Plaintiff for his claim against McGinn for national origin discrimination.  Id. at 105.  Plaintiff feels like he is now a "target" at work, causing him stress and anxiety to this day.  Pl. Depo. at 132-38.  Plaintiff has sought medical help for his stress.  Pl. Depo. at 141-42.

Defendant contends that Plaintiff has not established the elements required for a retaliation claim.  Defendant avers, first, that the actions taken by the Postal Service to "inform[] Plaintiff that he was going to be placed on administrative leave pending the outcome of an investigation into his threats against [Plaintiff's] superior [do] not constitute an adverse employment action" as required to meet the second prong of Plaintiff's prima facie case.  Def.'s Br. in Supp. S.J. Mot. at 15.  Defendant further contends that Plaintiff cannot show that the Postal Service took actions that could be characterized as antagonistic to Plaintiff as a result of Plaintiff's protected activity.  Id. at 17.  Rather, Defendant contends the Postal Service acted pursuant to the Postal Service Zero Tolerance Policy against threats of violence.  Id. at 17-18.  Defendant contends that the Policy required Defendant to investigate Plaintiff's testimony and actions taken to inform Plaintiff that he was to be put on administrative leave were also made consistent with the Policy.  Id. at 20.  Defendant avers that this provides a legitimate non-discriminatory basis for these actions.  Id.

Plaintiff responds that both the manner by which Defendant conducted the investigation of Plaintiff's testimony in "ordering Plaintiff to meet with a Postal Inspector" and Defendant's actions informing Plaintiff he would be placed on emergency leave were materially adverse.  Pl.'s Resp. at 14-15.  In support for his averment, Plaintiff points specifically to the EEOC determination that Defendant had engaged in treatment "reasonably likely to deter individuals from engaging in protected activity."  Id. at 15.  As to causation, Plaintiff contends that he had a

"well-documented history of filing claims and grievances against Defendant" and that both he and Lanetti testified that Defendant placed Plaintiff on administrative leave <u>because of</u> Plaintiff's protected conduct. <u>Id.</u> at 17. Plaintiff contends further that "there is testimony to suggest that . . . Dougherty believed that the incidents [of] March 21, 2007, were a result of retaliation by Defendant." <u>Id.</u> at 17. Plaintiff also implies that the timing of these actions is relevant to causation, but does not elaborate on these facts in his brief. <u>Id.</u> at 16-17. Finally, on the issue of pretext, Plaintiff's brief states simply that he "has proffered more than sufficient evidence to show that the actions Defendant took in response to testimony Plaintiff provided at the March 15, 2007, EEO hearing, on the basis that those actions were in line with Defendant's 'Zero Tolerance' policy on violence, was pretextual." <u>Id.</u> at 18. In Plaintiff's December 22, 2010 Letter Brief, he contends that inconsistencies in Defendant's actions and the timing of Plaintiff's placement on leave establish pretext. Pl.'s Letter Br. at 3 (ECF No. 29).

In reply, Defendant contends that the EEO determination regarding retaliation is not binding on this Court and cannot be the sole basis for a prima facie case. Def.'s Reply at 5-6. Defendant contends further that Plaintiff has provided no piece of evidence to support a finding of pretext and has, therefore, cannot survive summary judgment. <u>Id.</u> at 7.

## IV.    Legal Standards

### A.    Jurisdiction

The Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff brings a claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16. Venue is proper under 28 U.S.C. § 1391(b).

## B.    Standard of Review

Summary judgment is appropriate if the movant can show "that there is no genuine

dispute as to any material fact and that the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).[7]  A dispute is "genuine" if the evidence is such that a reasonable jury could

return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986).  A factual dispute is "material" if it might affect the outcome of the case under governing

law.  Id.

Where the non-moving party bears the burden of proof on a particular issue at trial, the

moving party's initial burden can be met simply by "pointing out to the district court that there is

an absence of evidence to support the non-moving party's case."  Celotex Corp. v. Catrett, 477

U.S. 317, 322 (1986).  Summary judgment is appropriate if the non-moving party fails to rebut

by making a factual showing "sufficient to establish the existence of an element essential to that

party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at

322.  Under Rule 56, the Court must view the evidence presented on the motion in the light most

favorable to the opposing party.  Anderson, 477 U.S. at 255.

---

[7]  Amendments to the Federal Rules Of Civil Procedure became effective on December 1, 2010.  The oft-cited summary judgment standard formerly found in Rule 56(c) is now located in Rule 56(a), with one alteration: the substitution of the word "dispute" for "issue," which the Rules Advisory Committee explained better describes the summary judgment inquiry, but does not affect the substantive standard or the applicability of prior decisions construing the standard.  Fed. R. Civ. P. 56(a); Fed.R.Civ.P. 56 Advisory Committee's Note.

Pursuant to 28 U.S.C. § 2074(a) and the April 28, 2010 Supreme Court order, the amendment will govern all proceedings commenced on or after December 1, 2010, and all proceedings then pending, "insofar as just and practicable."  United States Courts, Rules and Procedures, Rules and Forms Amendments Effective 12/1/10 (Jan. 11, 2011, 1:36 PM), http://www.uscourts.gov/Rule sAndPolicies/FederalRulemaking/Overview/RulesForms120110. aspx.  Thus, when necessary, the Court quotes to the amended rule.

## V.    Discussion

Title VII of the Civil Rights Act of 1964 protects employees from discrimination by their employers on the basis of race, color, religion, sex or national origin.  42 U.S.C. § 2000e-2.  A separate anti-retaliation provision of the Act "prohibits an employer from 'discriminat[ing] against' an employee or job applicant because that individual 'opposed any practice' made unlawful by Title VII or 'made a charge, testified, assisted, or participated in' a Title VII proceeding or investigation."  Burlington Northern & Santa Fe Ry. v. White, 548 U.S. 53, 56 (2006) (quoting § 2000e-3(a)).  Opposition to discrimination "can take the form of informal protests of discriminatory employment practices, including making complaints to management." Moore v. City of Philadelphia, 461 F.3d 331, 343 (3d Cir. 2006) (internal quotation and citation omitted).

The burden-shifting analysis established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), is appropriate for summary judgment motions in cases alleging employment retaliation under Title VII.  Plaintiff must first prove by a preponderance of the evidence that a prima facie case of unlawful discrimination or retaliation exists.  See Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994); Fogleman v. Mercy Hosp., Inc., 283 F.3d 561, 567-68 (3d Cir. 2002). The employee must prove that (1) he engaged in a protected employment activity under Title VII; (2) his employer took an adverse employment action after or contemporaneous with the protected activity; and (3) a causal link exists between the adverse action and the protected activity. Andreoli v. Gates, 482 F.3d 641, 649 (3d Cir. 2007); Marra v. Philadelphia Hous. Auth., 497 F.3d 286, 300 (3d Cir. 2007).

If the Plaintiff establishes a prima facie case, the burden shifts to the defendant to offer a

legitimate, non-discriminatory reason for the adverse employment action. See Marra, 497 F.3d at 300-01 (citing Woodson v. Scott Paper Co., 109 F.3d 913, 920 n.2 (3d Cir. 1997)). If a defendant is able to provide such a reason, the burden returns to the plaintiff, who must now show, by a preponderance of the evidence, that "the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." Moore, 461 F.3d at 342 (quoting Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500-01 (3d Cir. 1997)).

### A.        Plaintiff Has Engaged in Protected Activity

The record contains evidence that Plaintiff engaged in protected activity by filing both formal and informal complaints with Defendant's EEO investigators, including a claim of national origin discrimination filed in 2004 about which the March 15, 2007 hearing was held. iComplaints Report; Pl. Depo. at 19-20, 21, 23. Defendant does not dispute that Plaintiff was engaged in protected conduct and only disputes the second and third prima facie case requirements for retaliation.

Plaintiff's statement of Additional Facts Relevant to Plaintiff's Response to Defendant's Motion for Summary Judgment contains facts about Plaintiff's whistle-blower activities regarding falsified clock rings. Pl.'s Resp. at ¶¶ 51-55. However, Plaintiff did not allege in his complaint that Defendant took actions against him in retaliation for those activities, nor did he argue on this pending Motion for Summary Judgment that these activities should be considered protected activity for the purpose of this claim. Pl. Compl.; Pl. Resp. Defendant argued in its December 22, 2010 Letter Brief that evidence regarding Plaintiff's whistle-blower activities have "nothing to do with this case." Def.'s Letter Br. at 2. The Court finds that consideration of these activities would not alter the result in this case.

**B.     Plaintiff Fails to Establish An Adverse Action**

The anti-retaliation provision of Title VII protects individuals from "retaliation that produces an injury or harm." Burlington Northern, 548 U.S. at 67. For the harm to be actionable, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which . . . means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 68 (quotations and citation omitted). "[P]etty slights, minor annoyances, and simple lack of good manners" characteristic of a workplace will not normally constitute materially adverse employment actions, even if they follow protected conduct. Id. The Act limits its prohibitions to acts by employers that, viewed objectively, "are likely to deter victims of discrimination from complaining to the EEOC." Id. (internal quotation marks omitted). A court must judge the seriousness of an act in light of the particular circumstances of the case, recognizing that "[c]ontext matters" and an "act that would be immaterial in some situations is material in others." Id. at 69.

In certain circumstances, an employment suspension can constitute a materially adverse action. The plaintiff in Burlington Northern was suspended without pay from her forklift operator position for 37 days. Id. at 72. The Supreme Court found that, despite the plaintiff's reinstatement and receipt of back pay, she and her family still "had to live for 37 days without income [and without knowing] whether or when [the plaintiff] could return to work." Id. Recognizing the plaintiff's testimony regarding the severe physical and emotional hardship caused by the suspension, the Supreme Court held that "an indefinite suspension without pay could well act as a deterrent, even if the suspended employee eventually received back pay." Id. at 73.

However, failure to show harm, such as "resultant economic loss . . . or any change to the terms of [plaintiff's] employment" can be fatal to one's claim. Morrison v. Carpenter Technology Corp., 193 Fed. App'x 148, 154 (3d Cir. 2006) (finding "corrective performance review" not materially adverse as it did not result in any "harm or injury" and affirming grant of summary judgment to defendant). Thus, courts have not generally held "a suspension with pay pending a prompt investigation into allegations of wrong-doing [to] constitute an adverse employment action." Solomon v. Philadelphia Newspapers, Inc. No., 05-05326, 2008 WL 2221856, at *50 (E.D. Pa. May 21, 2008) (Giles, J.) (granting defendant summary judgment, citing numerous cases in other jurisdictions in which suspension not found to be adverse). In Solomon, relied upon by Defendant, but not addressed in Plaintiff's briefing, Judge Giles rejected the possibility that the plaintiff's nine-day suspension with pay pending investigation into a gun incident was materially adverse, particularly as compared to a subsequent suspension without pay followed by the plaintiff's termination. Id.

In this case, Plaintiff asserts that Defendant investigated him and placed him on administrative leave for fifteen minutes and that these actions were materially adverse. Pl.'s Resp. at 14-15. A dispute of fact exists as to whether Defendant actually placed Plaintiff on administrative leave for fifteen minutes or whether, as Defendant avers, Plaintiff was merely "under the belief" that he had been placed on administrative leave. Def.'s Statement of Undisputed Facts ¶ 38; Pl.'s Resp. ¶ 38. The record is also unclear whether Defendant intended the administrative leave to be with or without pay. Compare Smith Aff. at 220, with Grill Depo. at 21.

Nonetheless, even construing these facts in the light most favorable to Plaintiff, the Court

does not view Defendant's actions to approach the level of severity required by Burlington Northern, 548 U.S. at 70-73. Assuming Defendant temporarily suspended Plaintiff from employment without pay for fifteen minutes, Plaintiff was neither taken off the clock nor docked any wages for this time period and, instead, returned to finish his work day. This Court does not find that Defendant subjected Plaintiff to any of the hardship experienced by the Burlington Northern plaintiff and her family. Defendant rescinded the leave order before Plaintiff was subject to any economic burden or uncertainty. Plaintiff has put forth no evidence of economic loss, demotion, or decline in employment status that occurred as a result of or in relation to Defendant's actions. Nor has Plaintiff established that he was subject to antagonism by any of the Postal Service managers or supervisors involved in the investigation or by any Postal Service employee during the events surrounding the investigation. The Court finds that no reasonable employee could have perceived the temporary fifteen-minute leave, even without pay, to be a deterrent. In fact, compared to other employment discrimination cases seen by this Court, any adversity experienced by Plaintiff was de minimus and his claim borders on frivolous.

Further, a plaintiff's "subjective" experience of apprehension or intimidation resulting from threats made following protected actions does not, alone, establish materially adverse action. Compare Nolan v. Swartz Campbell, LLC, No. 05-1508, 2008 WL 598291, at *17-20 (W.D. Pa. Feb. 29, 2008) (Cercone, J.) (concluding on motion for summary judgment that being yelled at by a supervisor after complaining of sexual harassment did not establish adverse action) and Nagle v. RMA, The Risk Management Ass'n, 513 F. Supp. 2d 383, 390-91 (E.D. Pa. 2007) (Kauffman, J.) (finding a "heated" 65-minute meeting at which plaintiff alleged she "was harassed, insulted, and threatened with loss of her employment," leaving plaintiff with the

"subjective belief that her career . . . was over," not to be materially adverse and granting summary judgment to defendant); with Killen v. Nw. Human Servs., No. 06-4100, 2007 WL 2684541, at *7 (E.D. Pa. Sept. 7, 2007) (Dalzell, J.) (finding "potentially embarrassing" threat of administrative leave combined with threat of a "painstaking audit of [plaintiff's]financial dealings" could have dissuaded a reasonable employee from filing a discrimination claim, but rejecting plaintiff's argument on causation).

Plaintiff contends he found the experience of being temporarily placed on administrative leave confusing, in light of Plaintiff's belief that the issue had been resolved by his earlier meeting with Postal Inspector Dougherty. Pl.'s Resp. at 15-16. Plaintiff also asserts he was embarrassed and humiliated by being escorted before co-workers to clean out his locker and that, in the moment, Plaintiff felt like he was about to be fired. Pl. Depo. at 96:21-24; 100:8-11; 103:2-2; 133:2-134:1. However, the Court finds that Plaintiff has not provided any context from which to discern that these subjective feelings would have dissuaded a reasonable employee from engaging in protected activities.

Plaintiff has brought no case law to the attention of the Court to support his contention that being (1) ordered to meet with a Postal Inspector or (2) placed on emergency leave for fifteen minutes and ordered to clear out his locker constitutes adverse action. Plaintiff relies solely on the argument that the OFO determined Defendant's conduct amounted to retaliation. Pl.'s Resp. at 14-15. Plaintiff contends that an OFO determination of adverse treatment is admissible to help establish a prima facie case, citing Philbrook v. Ansonia Board of Education, 757 F.2d 476, 481 (2d Cir. 1985), and Smith v. Universal Services., 454 F.2d 154, 157-58 (5th Cir. 1972). In the Third Circuit, this decision is left to the discretion of the trial court. Coleman

v. Home Depot, Inc., 306 F.3d 1333, 1344 (3d Cir. 2002). While declining to rule on the admissibility of this report at this time, the Court has found no precedent that Plaintiff can rely on the OFO decision alone to establish an adverse action.[8]

C.     **Defendant Has Established a Legitimate Non-Discriminatory Reason For Requiring Plaintiff To Submit to Investigation By Postal Inspector and Temporarily Placing Plaintiff On Administrative Leave**

Assuming that Plaintiff has established a prima facie case of retaliation, the burden of production now shifts to Defendant to "clearly set forth through the introduction of admissible evidence, the reasons" for its investigation into Plaintiff and his temporary placement on administrative leave. Stewart v. Rutgers, The State Univ., 120 F.3d 426, 432 (3d Cir. 1997) (citing Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 255 (1981)). Defendant's burden in establishing a legitimate non-discriminatory reason for the actions taken in response to Plaintiff's protected conduct is "relatively light" in that Defendant "need not prove that the articulated reason actually motivated the [action]." Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 189 (3d Cir. 2003) (citing Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500 (3d Cir. 1997)).

Defendant contends that any actions taken to investigate Plaintiff's testimony or place Plaintiff on administrative leave were taken pursuant to the Postal Service Zero Tolerance Policy with respect to threats of violence.

In Venter, Judge Conti also addressed application of the Policy in a retaliation claim. The

_____

[8] The Court finds analysis of the causation element to be unnecessary. The Court will assume that were Plaintiff able to meet his burden as to adverse action, he would also be able to meet his burden as to causation. The Court will, therefore, proceed to analysis of the legitimate non-discriminatory reason and pretext elements.

plaintiff in Venter had stated to nurses at the Postal Service Occupational Health Office ("OHO") "that he wanted to 'punch' or 'kill'" his union steward, who had stymied the plaintiff's efforts to file a grievance.  Id. at 417.  The plaintiff's distraught manner concerned the OHO nurses, who sent him to meet with a supervisor, to whom plaintiff reiterated his desire to "kill" the steward.  Id. at 417-18.  The plaintiff was sent home and, two days later, managers convened a threat assessment meeting.  Id. at 418.  A "predisciplinary interview" was conducted almost three weeks later, at which the plaintiff reiterated his statement, but "indicated . . . that he never intended to actually harm [the steward], and that he had made that clear to [the steward]."  Id.  Within a week, supervisors recommended that the plaintiff be terminated.  Id.  The plaintiff was ultimately terminated a month and half later.  Id.

Although the plaintiff in Venter was able to establish a prima facie case of retaliation, id. at 427, Judge Conti found that the evidence supported a finding that the Postal Service met its burden of establishing a legitimate non-discriminatory reason for terminating the plaintiff.  Id. 427-28.  Each piece of evidence put forth by Postal Service documenting the disciplinary process against the plaintiff -- (1) the request for disciplinary action, (2) the recommendation for termination, (3) the "Notice of Proposed Removal," and (4) the "Letter of Decision" – indicated that the plaintiff's supervisors took action because of the plaintiff's statements and perceived "hostile behavior . . . . rather than because of his statutorily-protected activity."  Id. at 428.  In addition, Judge Conti found supportive testimony of three different supervisors that their actions were taken pursuant to the Zero Tolerance Policy.  Notably, one supervisor testified that he was personally familiar with a prior shooting incident "perpetrated by a disgruntled former postal employee," and another testified that the Postal Service "prohibited employees from even 'joking

around' about wanting to physically harm someone else." Id. at 428.

The Court finds, consistently with Venter, that Defendant has met its burden to establish that the chain of events leading to both Plaintiff's meeting with the Postal Inspector and the Threat Assessment meeting that resulted in Plaintiff's fifteen minutes of administrative leave were initiated because of Defendant's Zero Tolerance Policy. Unlike in Venter, Defendant has not provided written documentation regarding the communication that led up to (1) the convening of the Threat Assessment meeting, (2) the directive that Plaintiff meet with the Postal Inspector, or (3) the order that Plaintiff be placed on administrative leave. However, the Court does not find this fatal to Defendant's efforts to meet its burden. Plaintiff's supervisors resolved their response to Plaintiff's testimony far earlier in the assessment process than occurred in Venter and, thus, Plaintiff's supervisors may not have produced the same type of paper trail as was seen in the prior case. In addition, Defendant has provided ample documentation of the "unequivocal policy of the Postal Service" towards threats of violence. See e.g. Joint Statement Manual; Threat Assessment Guide. Nor does Plaintiff dispute the existence of the policy. Pl. Depo. at 120-23.

Further, Defendant has provided significant testimonial evidence to meet its "relatively light" burden at this stage. Shellenberger, 318 F.3d at 189. It is undisputed that Plaintiff testified at the EEOC hearing about his desire to "throttle" and "kill" his supervisor because of issues regarding Plaintiff's overtime pay and leave. EEO Hearing Transcript, pp. 67-68; 71; 74. Barksdale, who represented Defendant at the hearing, testified in her deposition that she deemed the testimony given by Plaintiff to be "in violation of the Zero Tolerance Policy" and believed Plaintiff's testimony "necessitated . . . notifying someone else[, in this case] human resources."

Barksdale Depo. at 8.  She believed that she would be disciplined if she did not report Plaintiff's testimony, but stated that it was the job of someone more qualified than she to make the threat assessment.  Id. at 12, 16, 19.  Meingossner, who attended the hearing as an assistant to Barksdale, testified, as well, that he made particular note of Plaintiff's testimony because the Post Office "takes threats of violence seriously."  Meingossner Depo. at 14-15.

Jordan stated in an affidavit that the decision was made to send the Postal Inspector to question Plaintiff directly in response to testimony given by Plaintiff "under oath" at the hearing and pursuant to "[p]ostal regulations set forth in Publication 108 and [the] Employee Labor Relations Manual."  Jordan Aff. at 228-30.

Smith stated in her affidavit that the decision to place Plaintiff on "non-duty pay status on administrative leave, pending the results of the investigation" was made "to protect [Plaintiff's] interest as well as the interest of others involved."  Smith Aff. at 220.  Smith further stated that Postal Inspector Dougherty explained to her after his investigation that the terms used by Plaintiff mean something different in Scottish terms.  Id.  She testified that the order placing Plaintiff on leave was rescinded based on the Postal Inspector's recommendations that Plaintiff was not a threat and "should be allowed to remain on the clock."  Id.; Smith Depo. at 43.  However, Smith explained that the managers did not have the information from the Postal Inspector until Plaintiff had been placed on leave and so the emergency placement had to be rescinded.  Id. at 222.

The Court finds that Defendant has put forth sufficient evidence to meet its burden of establishing a legitimate non-discriminatory reason for its actions.  Accordingly, the burden now shifts back to Plaintiff to prove that these reasons were not true, but rather were merely pretext for their retaliation against him for his EEOC activities.

**D.    Plaintiff Has Not Provided Sufficient Evidence to Establish Pretext.**

Plaintiff has the burden of persuasion to prove that Defendant's real reason for placing Plaintiff on administrative leave was in fact retaliation for Plaintiff's participation in the EEOC hearing or other protected activities. Fuentes, 32 F.3d at 764. Assuming Plaintiff has established a prima facie case of retaliation and applying the Third Circuit's two pronged analysis set forth in Fuentes, Plaintiff may defeat summary judgment by adducing direct or circumstantial evidence (1) casting "sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication;" or (2) allowing the factfinder to infer that retaliation for protected activities "was more likely than not a motivating or determinative cause of the adverse employment action." Barber v. CSX Distribution Services, 68 F.3d 694, 701 (3d Cir. 1995) (citing Fuentes, 32 F.3d at 762).

This requires a plaintiff to put forward "such weakness, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." Id. at 765. Plaintiff's evidence must rebut Defendant's proffered legitimate reason sufficiently to "allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons, . . . was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." Fuentes, 32 F.3d at 762**.**

It is not sufficient for Plaintiff to "simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." Fuentes, 32 F.3d at 765. As Judge Conti articulated in Venter, "[a]t the outset, it must be remembered that the

specific factual issue in this case is whether the [Postal Service] retaliated against [the plaintiff] for engaging in statutorily-protected activities[, not] the more general question of whether the challenged personal decision was otherwise appropriate." <u>Venter</u>, 694 F. Supp. 2d at 429.

      **1.**      **Plaintiff Has Not Produced Sufficient Evidence To Cast Doubt On The Veracity Of Defendant's Stated Legitimate Non-Discriminatory Reason.**

Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment is woefully inadequate as to the issue of pretext. After presenting the legal standard, Plaintiff's brief merely states that "Plaintiff has proffered more than sufficient evidence to show that the actions Defendant took in response to testimony Plaintiff provided at the March 15, 2007, EEO hearing, on the basis that those actions were in line with Defendant's 'Zero Tolerance' policy on violence, was pretextual." Pl.'s Resp. at 18. Plaintiff similarly offered no support on pretext in oral argument. In Plaintiff's December 22, 2010 letter brief submitted at the Court's request following oral argument, Plaintiff provides a list of reasons, without citations to the record, why the "actions of Defendant were clearly pretextual." Pl.'s Letter Br. at 3. Plaintiff has produced no evidence to allow the Court to infer that retaliation was a "motivating or determinative cause" of Defendant's actions.

Plaintiff contends generally that evidence shows Defendant's actions to have been "inconsistent, weak, incoherent and not worthy of credence." <u>Id.</u> In support, Plaintiff offers, first, the fact that Defendant "waited a week before punishing Plaintiff" by placing him on administrative leave. <u>Id.</u> at 1. Defendant does not dispute that Plaintiff was allowed to work for five days between the EEO Hearing and the Threat Assessment Meeting. However, as discussed above, in reference to Defendant's asserted legitimate non-discriminatory reason, Defendant put

forth ample evidence that the Postal Service supervisors responded consistently with the Zero Tolerance to assess Plaintiff's level of risk. There is no evidence in the record that any Postal Service employee believed Plaintiff to present an extreme risk or require immediate action, only that Postal Service employees found Plaintiff's EEOC hearing testimony required some threat assessment and response. The fact that Defendant waited a week to place Plaintiff on leave does not throw Defendant's legitimate non-discriminatory reason into doubt.

Plaintiff also points to the timing of the leave order, which involved his being escorted to his locker at the end of the day, in front of other postal workers, and after he had been "cleared to go back to work" by the Postal Inspector. Pl.'s Letter Br. at 2. What Plaintiff describes here is a situation of "crossed wires." The evidence demonstrates that Postal Inspector Dougherty interviewed Plaintiff at Elkins Park on the morning of March 21, 2007. Smith testified that the directive to place Plaintiff on administrative leave was made to Grill and Knowles via conference call from the district office later that day. Smith Depo. at 41. Smith testified, as well, that she made the call to rescind the leave order immediately after hearing from the Postal Inspector, by telephone, that he did not consider Plaintiff to be a threat. Smith Depo. at 43-45. It is clear from the record that the district managers were not at Elkins Park and, thus, some lag time between the Postal Inspector's investigation, the delivery of his recommendations to the Team, and Smith's communications with the Acting Postmasters Elkins Park is perfectly reasonable. The Acting Postmasters themselves did not delay in informing Plaintiff that the managers had rescinded the leave order. Grill Depo. at 23. While the timing of the leave order may have been unfortunate and embarrassing to Plaintiff, it does not provide a basis upon which to infer pretext.

Third, Plaintiff contends that, while Defendant indicated that Plaintiff needed to be evaluated by someone with "criminal or psychological expertise," this was never done. Pl.'s Letter Br. at 1. Presumably, this contention refers to a statement by Barksdale explaining that it was not her job to "make the assessment" and that "someone else who is more qualified psychologically, or criminally or whatever makes that assessment." Id. at 12 (emphasis added). However, as the tenor of the statement implies, Barksdale was not describing a prescribed policy, but, rather, her own lack of expertise. Further, evidence in the record suggests that a Threat Assessment Team is made up generally of Postal Service managers, including Human Resources Managers, as opposed to individuals with specific criminal or psychological expertise in threat assessment. See Threat Assessment Guide; Venter, 694 F. Supp. 2d at 418. Plaintiff has provided no evidence that Defendants acted inconsistently with this policy in their assessment of Plaintiff.

Finally, Plaintiff contends that "an ordinary layperson could determine simply from the record that there was no threat because Plaintiff testified at the hearing as to how he had felt three years before, had not engaged in any violent behavior, and had no history of such behavior." Pl.'s Letter Br. at 1. Here, Plaintiff ignores the zero tolerance nature of the policy, which Defendant has established as "unequivocal" and non-discretionary. See e.g., Manual, Section 665.24; Threat Assessment Guide, pp. 4-5. Barksdale testified specifically that she had been instructed as a Postal Service mediator to report "any kind of" threatening statement made in "any forum" and that the policy allows for "no discretion." Id. at 9-10. She further testified of cases in which parties "made statements about how they felt in the past," as Plaintiff did in the hearing, and "acted on them in the present." Id. at 13.

Even were the Court to have found that Plaintiff had established a prima facie case of retaliation, Plaintiff has produced no evidence from which a fact finder could reasonably infer Defendant's legitimate non-discriminatory reason to be pretext for retaliation. Thus, Plaintiff has not met his burden at this stage.

## VI.     Motion for Stay

On December 7, 2010, Plaintiff filed a Motion for Stay (ECF No. 27). The basis for Plaintiff's Motion is a pending complaint of retaliation filed with the Postal Service EEO Agency. The EEOC completed its investigation on October 28, 2010, and Plaintiff is awaiting the issuance of a Right to File letter. Plaintiff claims that "[t]his case will be brought in Federal court and may substantially affect the instant matter." Pl.'s Br. in Supp. of Mot. to Stay 3. While contending that the two claims involve the same parties and similar defenses, Plaintiff does nothing to identify the relevant facts, parties, or defenses. Further, Plaintiff offers no basis to conclude that his receipt of a Right to File letter is anything but speculative. Finally, Plaintiff provides no indication as to why he is only now filing this Motion for Stay, if the EEOC completed its investigation in October.

In light of the Court's decision to grant Defendant's Motion for Summary Judgment, Plaintiff's Motion for Stay is denied as moot.

## VII.    Conclusion

For all the foregoing reasons, this Court grants Defendant's Motion for Summary Judgment and denies Plaintiff's Motion for Stay. An appropriate Order follows.

O:\CIVIL 09-10\09-4196 St. John v. Potter\St. John v. Potter, 09-4196 MSJ Memo.wpd